IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| JEFFREY T. BALDOCK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 06-3214-CV-S-NKL-SSA |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security ) | |
| ) | |
| Defendant. ) | |

ORDER

Pending before the Court is Plaintiff Jeffrey T. Baldock's ("Baldock") Motion for Summary Judgment [Doc. # 9]. Baldock seeks judicial review of the Commissioner's denial of his requests for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401, et seq., and supplemental security income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary. Because the Court finds that the Administrative Law Judge's decision is not supported by substantial evidence in the record as a whole, the Court reverses the ALJ's decision and remands for an award of benefits.

I.      **Factual Background**

    A.      **Medical Records**

When Baldock began seeking treatment for stress and depression in March 1998, he was initially diagnosed with marked to severe anxiety with depressive symptoms and placed on Serozone. In April, he reported explosive anger, noting that he "doesn't want to hurt anyone but feels very violent at times. Putting his fists through walls. Wants help… ." (Tr. 132.) He was referred to an outpatient psychiatrist but had some financial difficulty taking his medication regularly.

In January 2002, Baldock underwent an evaluation by Robert King, D.O., on referral from Disability Determinations Division. Baldock reported bipolar disorder for which he believed he was overmedicated, hearing loss in the left ear left untreated due to dead batteries in hearing aid, and pain in his back, wrist, shoulder, hip, ankle, and knee. Dr. King suspected that his pain was "secondary to his bipolar disorder." (Tr. 146.)

Around the same time, Lester Bland, Psy.D., a non-examining, non-treating Disability Determinations Section psychologist, concluded that Mr. Baldock suffered from bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes). (Tr. 153-54.) He viewed Baldock as having mild restrictions or difficulties in activities of daily living and maintaining social functioning, and moderate difficulty in maintaining concentration, persistence, or pace as well as in his ability to understand and remember detailed instructions and his ability to carry out detailed instructions.

In February 2002, Baldock began regular treatments with Angela Olomon, D.O., whom he saw fourteen times over the next year. Olomon consistently diagnosed Baldock with bipolar disorder and treated him with a variety of psychotropic medications such as Depakote, Zyprexa, Topomax, and Lexapro. (Tr. 167-78.) In April 2003, Dr. Olomon completed a Medical Source Statement–Mental, in which she found that Baldock was moderately limited in his ability to understand and remember detailed instructions; to maintain attention and concentration for extended periods; to perform activities with a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without supervision; to make simple work-related decisions; to accept instructions and respond appropriately to criticism from supervisors; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting; and to travel in unfamiliar places or use public transportation. She also found that Baldock was markedly limited in his ability to carry out detailed instructions; to work in coordination with or proximity to others without being distracted by them; to maintain a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to set realistic goals or make plans independently of others. (Tr. 243-245.)

In June 2003, Baldock received a rheumatology consultation from rheumatologist Joseph Mayus, M.D. Dr. Mayus found "Tender points are notable throughout the

posterolateral neck, mid-trapezius muscles along the scapular spine, medial scapula and iliac crest" and diagnosed fibromyalgia, sclerodactyly and clubbing, history of depression, decreased right knee reflex of uncertain significance, congestive obstructive pulmonary disease, and abnormal weight gain.  Mayus's diagnosis remained largely unchanged during a follow-up consultation two months later, and Baldock continued to see him regularly over the following year during which he reported increased depression and pain throughout his body.  He continued his psychotropic drug treatment all the while under the care of Dr. Olomon.

Dr. Mayus completed a Medical Source Statement–Physical in November 2004 in which he concluded that Baldock retained the physical capacity to frequently lift and/or carry 5 pounds in an eight-hour workday but could occasionally lift 10 pounds in an eight-hour workday; to stand and/or walk a total of 3 hours in an eight-hour workday; to stand and/or walk continuously on a regular basis during an eight-hour workday for 45 minutes; to sit a total of 6 hours in an eight-hour workday; and to sit continuously on a regular basis during an eight-hour workday for 1 hour.  He also noted that Baldock has a limited ability to push or pull due to chronic muscular pain; should never climb; could occasionally balance, stoop, kneel and crouch; should never crawl; could occasionally reach and handle; could frequently finger and feel; had limitations for heights and hazardous machinery due to medications and was unlimited in seeing, hearing and speaking.  (Tr. 304-305.)  Dr. Mayus further noted that rest for 20-30 minutes, two to

three times a day, would be necessary in coping with symptoms and that approximately ten times a month, Baldock's impairments would disrupt a regular work schedule for a period of three to four hours at a time. (Tr. 306.)

Dr. Olomon completed another Medical Source Statement – Mental in which she found that Baldock was moderately limited in his ability to understand and remember detailed instructions; to carry out very short and simple instructions; to maintain attention and concentration for extended periods; to perform activities on schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to ask simple questions or request assistance; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. (Tr. 308-10.) She found Baldock markedly limited in his ability to carry out detailed instructions; to maintain a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to respond appropriately to changes in the work setting. (Tr. 308-10.)

Baldock continued treatment with Dr. Olomon, D.O. During a November 10, 2004, appointment, he reported that he felt "draggy" and wanted to feel more energetic. Dr. Olomon diagnosed "Bipolar, mixed, mod" (Tr. 348) and prescribed Lexapro 10 mg; Zyprexa 5 mg and Zonegran 100 mg (Tr. 348). At his December appointment, he

reported that he had not been sleeping very well.  On a scale of one to ten his anxiety was a seven, depression was a five.  Olomon again diagnosed "Bipolar, mixed, mod" (Tr. 347) and prescribed Trazodone 50 mg in addition to all other current medications.  (Tr. 347.)  Dr. Olomon increased Baldock's Trazodone to 100 mg at his March 16, 2005, appointment.  Between April 13, 2005 and May 5, 2005, Baldock saw Dr. Olomon five times for psychiatric treatment.  On a scale of one to ten his anxiety was a six, depression was a five and his irritability was an eight.  (Tr. 337.)  The psychiatrist's diagnosis remained "Bipolar D/O, Mixed, Severe psychosis" but no medications were prescribed.  (Tr. 337.)

On May 17, 2005, Baldock saw Dr. Mayus for a follow-up appointment for his fibromyalgia.  He reported that he continued to have diffuse pain throughout his upper and lower back and was chronically fatigued.  He reported that he had interrupted sleep because of his chronic pain.  The physician diagnosed fibromyalgia, chronic depression and generalized anxiety, and chronic obstructive pulmonary disease, and prescribed Gabitril 4 mg; Lexapro 10 mg; and Seroquel 200 mg.  (Tr. 354-55.)  Baldock returned to Dr. Mayus on September 26, 2005, reporting that he continued to have diffuse pain throughout his shoulders, upper and lower back and particularly around the hip.  The physician diagnosed fibromyalgia and prescribed Diclofenac 75 mg.  (Tr. 351-52.)

During his May 11, 2005, appointment with Dr. Olomon, Baldock reported that on a scale of one to ten his anxiety was an eight, depression was an eight and his irritability

6

was a four to five. Olomon prescribed Seroquel 100 mg; Zonegran 100 mg; and Lexapro 30 mg. (Tr. 376.) Between July 6, 2005 and November 9, 2005, Baldock saw Olomon four more times. During one of those visits, he reported that his irritability was a "10 out of a 10." (Tr. 367.) On a scale of one to ten his anxiety was a seven, depression was a seven, anger was an eight, and racing thoughts were an eight. Olomon diagnosed paranoia psychosis and delusional disorder and prescribed Lexapro 300 mg, Zonegran 100 mg, Klonopin 0.5 mg and increased Seroquel to 50 mg twice daily and 300 mg as needed for irritability. (Tr. 368.)

### B.     Administrative Hearing

Baldock's case was heard by Administrative Law Judge Linda D. Carter on February 3, 2005. The only witnesses were Baldock and vocational expert Cathy Hodgson. Baldock testified that he was born on March 26, 1965, and that he had graduated from high school. He testified that he could read a newspaper and could write a grocery list. (Tr. 48-49.) He wore glasses, was 6 feet tall and weighed 175 pounds. He testified that he was right-handed and had a driver's license, but his parents brought him to the hearing and did most of the driving because he got lost easily. (Tr. 50.)

Baldock testified that he had not worked since July 1, 2001. He testified that he had side-effects from his medications as follows: "The first medication they started me on, I gained a lot of weight and I went up to 230 pounds and when they took me off of that [INAUDIBLE] and then another medication, I can't remember the name of it, I gained a lot of weight and when they took me off of it, I lost the weight again and went

7

back to my normal weight and the other side effects have been sometimes I don't sleep as well as I needed to and they've given me sleeping medication to try to offset that and that's really been about all, I think." (Tr. 50-51.)

Baldock testified that he had stopped working in July, 2001, because his pain increased and had been diagnosed with bipolar disorder in 1998. He kept working but sought treatment from the Kitchen Clinic. He testified, "I just couldn't take the stress and the demand of the job. I just couldn't take it anymore." (Tr. 51.) Baldock testified that he had been seeing Dr. Olomon as his treating psychiatrist since 2001. Baldock also testified that he had been diagnosed with fibromyalgia and bursitis. He testified that he had pain: "across the shoulders, in the back, in the lower back, I have pain, in the hips and in both knee, down in my neck . . . ." (Tr. 53.) He testified that Dr. Mayus was his treating rheumatologist and that he sees him once every six months and the only thing that he could do for his pain was prescribe pain medication and exercise. (Tr. 54.)

Baldock testified that the only exercise that he was able to do was long walks and trying to keep his body somewhat active, and trying to keep some normal motion in his joints. (Tr. 54.) He testified that he could only walk for about 20 minutes or so. He testified that he had pain in both knees on a daily basis but his right knee was worse than his left. (Tr. 54.) Baldock testified that his pain had not gotten any better since he had been off of work, that he had back pain on a daily basis and that he had numbness and a pins and needles sensation in his back. He testified that pain in his shoulders interfered in his daily activities and that he was never free from shoulder pain

and had weakness in his hands. He testified that his medications helped the pain but never took it away. (Tr. 57.)

Baldock testified that he could stand for about 30 minutes and could sit for 30-45 minutes and could lift about 50 pounds. He testified that he took several naps a day because of the pain in his legs, knees, back and hips. He testified that when he took his naps he was in a lying down position rather than just reclining. He testified that each nap was about 30 minutes to an hour long. (Tr. 57-58.)

Baldock testified that he had problems with depression which interfered with his daily living. He testified that when he had a bad day he would just stay off by himself and spend the time alone. He testified that his depression interfered with his sleep and his appetite. (Tr. 58.) He had problems with energy and concentration due to his depression. He testified that he would try to concentrate and read books but "the words jumble together and I'll just have to stop." (Tr. 59.) Baldock testified that he lived in a house with his parents. He testified that he had bouts with depression every couple of months and they last anywhere from a day to three days. (Tr. 59-60.) He testified that he had problems with anxiety and nervousness. (Tr. 60.)

Baldock testified that he tried helping his elderly parents around the house with chores. He testified that his hobbies were reading, fishing and watching animals. He testified that he only went fishing once in awhile. (Tr. 60-61.) Baldock testified that he was antisocial and was not able to leave his house sometimes. He testified that he did not belong to any churches or organizations. (Tr. 61.)

9

Baldock testified that in all five of his jobs it had been difficult for him to deal with the stress and get along with his co-workers. (Tr. 61.) He had breathing problems and had trouble with bronchitis. He had 95 percent hearing loss in the left ear and 65 percent n the right but he didn't wear hearing aids because they didn't help. Baldock testified that he helped on a beef farm maybe two to three times a week, and that it wasn't a regular schedule. (Tr. 68.) He testified that he would get the animals in the chute for tagging. (Tr. 68.)

In responding to the ALJ's hypothetical questions, vocational expert (VE) Cathy Hogsdon testified that Baldock was limited to light, sedentary work and would require some accommodation for sitting and standing requirements. Baldock's counsel then asked the VE to assume additional limitations on pushing and pulling, and repetitive motions. The VE responded that such limitations would preclude all work, given Baldock's inability to do any job involving customer service. Baldock's counsel also asked the VE to assume marked limitations in maintaining a normal workday and work week without interruptions from psychologically-based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods, marked limitations getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, and marked limitations responding appropriately to changes in the work setting. Again the VE said there would be no work for such an applicant.

## II. Discussion

Although the ALJ found that Baldock could not return to his past relevant work due to severe impairments of bipolar disorder and fibromyalgia, she nonetheless concluded that he could still perform a full range of light and sedentary work and was therefore not disabled. In reaching her conclusion, the ALJ found:

> The medical evidence shows that the claimant is diagnosed to have bipolar disorder, mixed, moderate, by his treating psychiatrist, Angela Olomon, D.O., with the Dallas County Family Medical Center. However, careful review of the actual treating records from Dr. Olomon shows that the claimant's condition is well controlled with psychotropic medications without significant adverse side effects . . . . [T]he undersigned notes that these findings differ from the medical source statements from Drs. Olomon and Mayus. . . . [I]n the present matter, the medical source statements from Dr. Olomon do not correspond with the actual treatment records of the claimant existing since 2002. The medical source statement from Dr. Mayus is clearly based upon subjective statements of the claimant and is without objective medical documentation in the treatment records. It is understandable that these physicians would wish to assist the claimant in his case for disability benefits, but their medical source statements are not well supported nor consistent with the other substantial evidence in the case record. The undersigned accords very little evidentiary weight to the medical source statements, but great weight to the actual treatment records from the claimant's treating physicians.

(Tr. 17, 22.) The ALJ's findings are not supported by substantial evidence in the record. Baldock saw Dr. Olomon 24 times between February 2002 and November 2004, during which she consistently diagnosed bipolar disorder. Although Olomon was Baldock's treating psychiatrist for almost three years, the ALJ found that Olomon's medical source statement was not supported by her treatment notes. The primary basis for this conclusion seems to be isolated statements by Baldock recorded in Olomon's notes in which he claims that he is feeling "pretty good" or "doing fine." The ALJ also relied on the assessment of Lester Bland, Psy.D. However, Dr. Bland has never examined Baldock

11

personally. His assessment was based on a review of Baldock's medical records as of January 2002, before Baldock even began treatment with Dr. Olomon. Bland never reviewed any of Olomon's treatment notes and did not have the benefit of her diagnoses when assessing Baldock's mental condition. No other psychiatrist has examined Baldock or reviewed his medical records and the ALJ did not request any consultation by another physician. Thus, Olomon's diagnoses and medical source statements remain uncontradicted in the record.

The ALJ also noted that "In the Medical Source Statement–Mental form dated April 23, 2003, Dr. Olomon did not state whether she included effects of drug and/or alcohol use in her assessment. In the Medical Source Statement–Mental completed on December 15, 2004, Dr. Olomon states that she has not separated drug addiction or alcoholism addiction from her assessment." (Tr. 18.) However, the Eighth Circuit has warned that an

> ALJ must base [her] disability determination on substantial evidence of [a claimant's] medical limitations without deductions for the assumed effects of substance use disorders. The inquiry here concerns strictly symptoms, not causes, and the rules for how to weigh evidence of symptoms remain well established. Substance use disorders are simply not among the evidentiary factors our precedents and the regulations identify as probative when an ALJ evaluates a physician's expert opinion in the initial determination of the claimant's disability.

*Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2003).

With regard to Baldock's physical impairments, the ALJ similarly discounted the notes, diagnoses, and medical source statement–physical from Baldock's treating rheumatologist, Dr. Mayus, noting that his opinion relied on Baldock's own subjective

12

statements and was not supported by objective medical evidence. Mayus diagnosed Baldock with fibromyalgia. As the Eighth Circuit has held, a fibromyalgia "diagnosis is usually made after eliminating other conditions, as there are no confirming diagnostic tests." *Forehand v. Barnhart*, 364 F.3d 984, 987 (8th Cir. 2004). Yet, the ALJ discounted Mayus's opinion–a treating rheumatologist–by pointing to notes taken in 2002 by David Kramer, M.D., in which Dr. Kramer noted that Baldock "denied problems with respitory, musculoskeletal and neurological symptoms." (Tr. 20.) But Dr. Kramer saw Baldock for an eye exam, not a rheumalogical consultation, a year before Baldock began seeing Dr. Mayus or had ever been diagnosed with fibromyalgia. Baldock cannot be faulted for not reporting an as-of-yet undiagnosed neurological or musculoskeletal condition to his eye doctor.

The ALJ erred in giving greater weight to outdated opinions of an eye doctor and a non-treating consulting physician than to Baldock's treating psychiatrist and rheumatologist. *Forehand*, 364 F.3d at 987 ("We have long recognized that fibromyalgia has the potential to be disabling . . . . [To] the extent that [a one time consulting] report was inconsistent with [Claimant's] historical diagnoses and treatment, the ALJ erred by giving greater weight to [the consulting physician's] report. The opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence."). As there are no other medical opinions in the records which contradict the diagnoses and medical source statements of Baldock's treating physicians or which offer substantial support for the ALJ's decision, her decision must be reversed.

13

## III. Conclusion

Accordingly, it is hereby

ORDERED that Plaintiff's Motion for Summary Judgment [Doc. # 4] is GRANTED. The decision of the Commissioner is REVERSED and REMANDED with instructions to award benefits.

s/ Nanette K. Laughrey<br>
NANETTE K. LAUGHREY<br>
United States District Judge

Dated: March 6, 2007
Jefferson City, Missouri